FILED

**TO BE FILED IN CAMERA AND UNDER SEAL**

2009 JAN -7 A 9:29

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PLAINTIFF UNDER SEAL | CIVIL ACTION NO. 1:09CV13 CMH/TCB |
| v. | |
| DEFENDANT UNDER SEAL | **FILED IN CAMERA** |
| | **UNDER SEAL** |
| | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729, *ET SEQ.***


Jeffrey J. Downey
The Law Office of Jeffrey J. Downey, P.C.
1225 I Street, N.W., Suite 600
Washington, D.C. 20005
Phone 202-712-9120
Fax 202-789-1116

TO BE FILED IN CAMERA AND UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. CHRISTINE A. RIBIK<br>Relator,<br><br>v.<br><br>**MANOR CARE Inc.**<br>**d/b/a HCR MANOR CARE**<br>**a/k/a HCR Manor Care Inc.**<br><br>SERVE REGISTERED AGENT:<br>CT Corporation System<br>4701 Cox Road<br>Suite 301<br>Glen Allen, VA 23060,<br><br>-AND-<br>**MANOR CARE – FAIR OAKS of FAIRFAX VA, LLC**<br>**d/b/a MANORCARE HEALTH SERVICES-**<br>**FAIR OAKS**<br><br>SERVE REGISTERED AGENT:<br>CT Corporation System<br>4701 Cox Road<br>Suite 301<br>Glen Allen, VA 23060,<br><br>-AND-<br><br>**MANOR CARE OF ARLINGTON VA, LLC**<br>**d/b/a MANORCARE HEALTH SERVICES-ARLINGTON**<br>550 South Carlin Springs Road<br>Arlington, Virginia 22204<br>**SERVE REGISTERED AGENT:**<br>CT Corporation System | CIVIL ACTION NO. 1:09cv13<br><br>**FILED IN CAMERA**<br><br>**UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

Suite 301
Glen Allen, VA 23060,

**MANOR CARE OF ALEXANDRIA VA, LLC**
**d/b/a MANORCARE HEALTH SERVICES –**
**Alexandria**
1510 Collingswood Road
Alexandria VA 22308
SERVE REGISTERED AGENT:
CT Corporation System
4701 Cox Road
Suite 301
Glen Allen, VA 23060,

**The CARLYLE GROUP**
**a/k/a CARLYLE-MANORCARE**
Serve: Registered Agent
L Carlyle Swafford
159 E Queen Street
Strasburg, VA 22657

**CARLYLE MC PARTNERS, L.P.**
Serve: Registered Agent
L Carlyle Swafford
159 E Queen Street
Strasburg, VA 22657

**CARLYLE PARTNERS V MC, L.P.**
Serve: Registered Agent
L Carlyle Swafford
159 E Queen Street
Strasburg, VA 22657

Defendants.

**Also Serve:**
Chuck Rosenberg, U.S. Attorney
Justin W. Williams U.S. Attorney's Bld
2100 Jamieson Avenue

Alexandria, VA 22314 )

and )

U.S. Attorney General Michael B. Mukasey )
Department of Justice )
Room 4400 )
950 Pennsylvania Ave, N.W. )
Washington, D.C. 20530-0001 )

**<u>COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS</u>**
**<u>31 U.S.C. § 3729, ET SEQ.</u>**

COMES NOW RELATOR on her own behalf and on behalf of the United States of America, by and through her attorney, against the above named Defendants pursuant to the *qui tam* and retaliation provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, and moves the honorable court for judgment against Defendants, as follows:

## I. <u>JURISDICTION AND VENUE</u>

1. This is a civil action arising under the laws of the United States of America to redress violations of federal acts; therefore this Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331.

2. This Court has personal jurisdiction over this action pursuant to 31 U.S. C. § 3732(a) of the False Claims Act, which provides that a *qui tam* action may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, can be found, reside, transact business or in which any act proscribed by § 3729 *et seq.* occurred.

3. Venue in the Eastern District of Virginia is appropriate under 31 U.S.C. §§ 3732(a) and 28 U.S.C. 1391(b) and (c) because Manor Care Inc., HCR Manor Care, Inc., ManorCare Health Services-Fair

Oaks, the Carlyle Group, Carlyle MC Partners, L.P., Carlyle Partners V MC L.P., and ManorCare Health Services-Arlington, (collectively "Defendants"), transacted business in the Eastern District of Virginia and committed acts proscribed by 31 U.S.C. § 3729 *et seq.*

4. The causes of action alleged herein are timely brought because of Defendants' efforts to conceal from the United States their wrongdoing in connection with the allegations made herein and because Defendants' conduct, as described below, is ongoing.

## II. PARTIES

5. Relator Christine A. Ribik ("Relator" or "Relator Ribik") is a citizen of the United States who resides in the city of Oakton in the Commonwealth of Virginia. Her address is post office box 530, Oakton, Virginia 22124. Relator Ribik has been a licensed occupational therapist for over twenty-five (25) years, has published articles in her field and has been a guest lecturer at universities such as Temple University of Philadelphia, Pennsylvania. Relator Ribik worked as a PRN occupational therapist for Defendant Manor Care from May 2003 until January 2004. While employed by Defendants, Relator witnessed therapists and other staff members commit numerous offenses in violation of Medicare regulations, which give rise to violations of the False Claims Act as explained in greater detail below.

6. Prior to filing this Complaint, Relator brought the wrongdoing described herein to Defendants' attention. Rather than address Relator's concern or attempt to conform to Medicare regulations, Defendants retaliated against Relator in violation of 31 U.S.C. § 3730(h). Relator has provided the government with information and documents prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2). Relator is an original source of this information and this complaint is not based upon publicly disclosed information.

7. Defendant Manor Care Inc. d/b/a HCR Manor Care, Inc. ("Manor Care") is a Corporation with its principal place of business at 333 North Summit Street, Toledo, Ohio 43604. Manor Care is a publicly-traded corporation on the New York Stock Exchange and provides a range of health care

services, including skilled nursing care, assisted living, post-acute medical and rehabilitation care, hospice care, home health care and rehabilitation therapy services. As of December 31, 2006, the company operated 278 skilled nursing facilities including the three facilities that are named as Defendants herein. The illegal and fraudulent practices at issue directly involve Manor Care facilities located in the county of Fairfax, the County of Arlington and the City of Alexandria.

8. Defendant Manor Care of Alexandria, VA, LLC d/b/a ManorCare Health Services – Alexandria, a subsidiary of HCR Manor Care, Inc. was at all times alleged herein operating a skilled care nursing facility at 1510 Collingwood Road, Alexandria, Virginia. ManorCare Fair Oaks, owned by HCR Manor Care, was directly involved in illegal and fraudulent billing practices, as more fully described below.

9. Defendant Manor Care-Fair Oaks of Fairfax VA,LLC d/b/a ManorCare Health Services–Fair Oaks ("ManorCare Fair Oaks") is a subsidiary of HCR Manor Care, Inc. ManorCare-Fair Oaks is located at 12475 Lee Jackson Memorial Highway, Fairfax, VA 22033. ManorCare Fair Oaks is a skilled nursing facility as well as an Alzheimer's assisted living center offering services that include subacute medical and rehabilitation programs for short term patients transitioning from hospital to home, skilled nursing care and Alzheimer's care. Defendant ManorCare Fair Oaks has a total of 145 beds, 59 of which are located in the skilled nursing facility. ManorCare Fair Oaks, owned by HCR Manor Care, was directly involved in illegal and fraudulent billing practices, as more fully described below.

10. Defendant Manor Care of Arlington VA, LLC, d/b/a ManorCare Health Services–Arlington ("ManorCare Arlington"), is a subsidiary of Manor Care, Inc. ManorCare Arlington is located at 550 South Carlin Springs Road, Arlington, Virginia 22204. ManorCare Arlington is a 171-bed skilled nursing and rehabilitation therapy services center offering services which include subacute medical and rehabilitation programs for short term patients transitioning from hospital to home and skilled nursing care. ManorCare Arlington, owned and operated by Manor Care Inc, was directly involved in illegal and fraudulent practices, as more fully described below.

11. For its fiscal year ending in 2004, Manor Care Inc. filed with the United States Securities and Exchange Commission an annual 10-K report pursuant to Section 13 and 15(d) of the Securities and Exchange Act of 1934. In its 10-K Manor Care Inc. states:

> Manor Care, Inc., which we also refer to as Manor Care and HCR Manor Care, provides a range of health care services, including skilled nursing, assisted living, subacute medical and rehabilitation care, hospice care, home health care and rehabilitation therapy. . .
>
> We are a leading owner and operator of long term care centers in the United States, with a majority of our facilities operating under the respected Heartland, ManorCare and Arden Courts names. On December 31, 2004 we operated 729 skilled nursing facilities, 65 assisted living facilities in 31 states with 62% of our facilities located in Florida, Illinois, Michigan, Ohio and Pennsylvania.
>
> Skilled Nursing Centers. Our facilities use interdisciplinary teams of experienced medical professionals to provide services prescribed by physicians. . . We design "quality of life" programs to give the highest practicable level of functional independence to patients. Licensed therapists provide physical, speech, respiratory, and occupational therapy for patients recovering from strokes, heart attacks, orthopedic conditions, or other illnesses, injuries or disabilities.

12. In December of 2007 Manor Care Inc. and its respective nursing homes including Manor Care of Arlington VA, LLC, d/b/a ManorCare Health Services–Arlington, Manor Care-Fair Oaks of Fairfax VA, LLC d/b/a ManorCare Health Services–Fair Oaks and ManorCare of Alexandria, VA, LLC d/b/a ManorCare Health Services – Alexandria were acquired by the Carlyle Group through a merger that was approved by Manor Care's stockholders on October 17, 2007. The Carlyle Group is not a health care provider and prior to the merger it had no experience in operating long term care facilities.

13. After the merger the Carlyle Group effectively managed and controlled the operation of Defendant nursing homes through its subsidiary companies Carlyle MC Partners, L.P. and Carlyle Partners V MC, L.P. Manor Care stock was no longer traded on the stock exchange. However, the Manor Care management team that was in place at the time of the merger, including President Paul Ormond and his staff, remained in place to operate the business. The Carlyle group exercised ultimate

control over these entities through its policies, procedures, internal guidelines and financial goals. The Carlyle group also controlled billing and reimbursement decisions that were made at their local nursing homes, and further recouped revenues that were generated by Medicare payments for skilled physical and occupation therapy.

14. As part of the merger, the Carlyle Group issued their "Patient First Pledge" that included promises of training for caregivers, maintaining adequate staffing levels, ensuring quality care, and meeting state and federal requirements. As per Carlyle's press release issued on October 22, 2007,

> We will maintain our primary focus on providing care for patients who require complex medical care and intensive rehabilitation, those whom other providers must often turn away.
>
> We will continue to staff based on our patients' clinical needs, many of whom are higher acquity, while striving to exceed all federal and state regulations
>
> We will provide capital investment that helps ensure Manor Care's facilities continue to be well-maintained, attractive structures, as well as state of the art in their rehabilitation capabilities, clinical technology and record keeping.

15. In effecting the takeover of all Manor Care nursing home the Carlyle group restructured Manor Care and its corporate entities in a manner that helped shield them from liability. It used a four-tiered corporate structure with holding companies, limited liability corporations and affiliated corporations. While Defendant Carlyle group set up complex corporate structures to operate Defendant Manor Care nursing homes, as the corporate parent it retained primary control over all financial aspects of the nursing homes' business, including billing and reimbursement.

16. Defendant Carlyle group and its subsidiaries Carlyle MC Partners, L.P. and Carlyle Partners V MC, L.P. in Virginia were aware at the time of the merger that long term care facilities could obtain higher revenues by focusing on the provision of skilled physical therapy and rehabilitation, which

allowed billing beyond the routine Medicare charges allowed in a SNF (skilled nursing facility). Defendants Carlyle group and its subsidiaries Carlyle MC Partners, L.P. and Carlyle Partners V MC, L.P. knew or should have known of the various fraudulent and improper billing practices described below, yet failed to take any affirmative action to prevent these ongoing abuses. To the contrary, since these unlawful billing practices increased Medicare revenues, they were condoned and encouraged as part of a corporate strategy to maximize billing for skilled therapy. After the merger, ManorCare facilities including Manor Care of Arlington VA, LLC, d/b/a ManorCare Health Services–Arlington, Manor Care-Fair Oaks of Fairfax VA, LLC, d/b/a ManorCare Health Services–Fair Oaks and Manor Care of Alexandria, VA, LLC d/b/a ManorCare Health Services – Alexandria increased their billing goals for their physical and occupational therapy staff.

17. At all times herein Defendants Manor Care Inc., HCR Manor Care, Manor Care of Arlington VA, LLC, d/b/a ManorCare Health Services–Arlington, ManorCare-Fair Oaks of Fairfax VA, d/b/a ManorCare Health Services–Fair Oaks and ManorCare of Alexandria, VA, LLC d/b/a ManorCare Health Services – Alexandria, the Carlyle Group, Carlyle MC Partners and L.P., Carlyle Partners V MC L.P., were involved in a joint venture. These Defendants combined their staff and resources for purposes of engaging in a joint business enterprise, with the understanding that they would share in the profits or losses. Each entity had a voice in the operation or control of their respective nursing homes.

### A. <u>Medicare</u>

18. The Medicare Program ("Medicare") is the federal health insurance program for the aged and disabled established by Congress in 1965 as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395, *et seq.* Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"). CMS is a division of the United

States Department of Health and Human Services ("HHS"). Defendants are certified and approved as providers or suppliers under the Medicare Program.

19. The Medicare Program is divided into three parts: (a) hospital insurance (also known as Part A), (b) supplementary medical insurance, (also known as Part B), which pays for covered services rendered to beneficiaries in Skilled Nursing Facilities ("SNF") under both Part A and Part B of the Program, and (c) Part C of the Medicare Program, or "Medicare + Choice," which provides new health care options in addition to basic Medicare benefits. *See* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled); *see also* 42 U.S.C. §§ 1395j through 1395w-4 (Part B – Supplemental Medical Insurance Benefits for the Aged and Disabled); 42 U.S.C. § 1395w-21 (Medicare + Choice Plan).

**1. <u>Medicare Part A</u>**

20. Medicare Part A ("Part A") is so called because the governing law is found in Part A of Title XVIII of the Social Security Act. Some of the services that are covered under Part A include, without limitation: (a) part-time or intermittent skilled nursing care and home health aide services; (b) physical, speech, and occupational therapy; (c) medical equipment and supplies; and (d) social services. *See* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled).

21. In order to receive coverage under Part A for SNF care, beneficiaries must continue to meet regular eligibility requirements. That is, a beneficiary must have been an inpatient of a hospital for a medically necessary stay of at least three (3) consecutive calendar days. In addition, within thirty (30) days after discharge from a hospital, the beneficiary must have been transferred to a SNF that signed a participating agreement with CMS. Further, the beneficiary must require daily skilled nursing or rehabilitation services. 42 U.S.C. § 1395x(i); HCFA Skilled Nursing Facility Manual, Chapter 2 – Coverage of Services, § 212, *et seq.*

22. If a beneficiary meets these eligibility requirements, Medicare provides one hundred (100) days of Part A SNF coverage per benefit period. 42 U.S.C. § 1395(a)(2).

### 2. Medicare Part B

23. Medicare Part B ("Part B") provides supplemental medical insurance and only provides for payment of those services that are medically necessary. *See* 42 C.F.R. § 410.3 (Scope of Benefits).

24. Part B is a voluntary program financed in part through premiums paid by the participants. Each Part B participant must pay a basic monthly premium as well as any deductible or co-insurance amount. *See* CMS Carrier Manual, Part 3, Chapter I – Entitlement and Enrollment, § 208.

25. Part B is also funded by the Federal Government. There are two ways that the government makes payment under Part B of the Medicare Program: (1) directly to the physician or facility – the assignment method; or (2) to the patient who is obligated to reimburse the physician or facility. *See* CMS Carrier, Manual, Part 3, Chapter III – Claims Filing Jurisdiction and Development Procedures, § 3001.

### B. Medicare and SNFs

26. Section 4432(a) of the Balanced Budget Act ("BBA") of 1997 modified how payment was made by the government for SNF services. Effective with cost reporting periods beginning on or after July 1, 1998, SNFs transitioned to the Prospective Payment System ("PPS"). Under the PPS, SNFs received a fixed *per diem* rate for all Part A post-hospital extended care services. As such, SNFs could no longer bill the government based on reasonable costs or through low volume, prospectively determined rates for covered Part A SNF services provided to patients.

### 1. Setting Payment Rates (using RUGs)

27. The initial payment rates to SNFs set in 1998 reflected the projected amount that SNFs received in 1995, updated for inflation. The base payment rates were computed separately for urban and rural areas and were updated annually based on the projected increase in the SNF market basket

index, a measure of the national average price level for the goods and services SNFs purchase to provide care.

28. Daily payments to SNFs are determined by adjusting the base payment rates for geographic differences in labor costs and case mix. To adjust for labor cost differences, the labor-related portion of the total daily rate – seventy-six percent (76%) for fiscal year 2007 – is multiplied by the hospital wage index in the SNF's location and the result is added to the non-labor portion.

29. The daily base rates are adjusted for case mix using a system known as Resource Utilization Groups ("RUGs"). Each RUG has associated nursing and therapy weights that are applied to the base payment rates. These weights were developed using time study data from 1990, 1995, and 1997. These weights have been updated since the implementation of PPS.

30. The fifty-three (53) group RUG classification system went into effect January 1, 2006, replacing the forty-four (44) group RUG system. The 53 group system added nine (9) new payment groups for patients who meet the criteria for "extensive services" and "rehabilitation" groups. Patients are assigned to one of the 53 RUGs based on patient characteristics and service use that are expected to require similar resources.

31. Assignment of a beneficiary to one of the RUGs is based on the number of minutes of therapy (physical, occupational, or speech) that the patient has used or is expected to use; the need for certain services (e.g., respiratory therapy or specialized feeding); the presence of certain conditions (e.g., pneumonia or dehydration); an index based on the patient's ability to perform independently four activities of daily living (e.g., eating, toileting, bed mobility, and transferring); and in some cases, signs of depression. Patients' characteristics and service use are determined by periodic assessments using the SNF patient assessment instrument, known as the Minimum Data Set.

32. There are five RUG classifications delineated by the amount of time a patient is required to be in therapy in order to achieve the expected therapeutic result. The classifications are: Ultra high

(over 720 minutes), Very high (500-719 minutes), High (325-499 minutes), Medium (150-324 minutes), and Low (45-149 minutes).

### 2. Overpayments in Medicare Reimbursements to SNFs

33. When an incorrect payment is made to a SNF, it is responsible for the payment unless the intermediary determines that it was without fault.

34. Under the following situations, SNFs are liable for any overpayment: (a) when a SNF furnished erroneous information or failed to disclose facts it knew or should have known were relevant to payment of a benefit; (b) the overpayment was due to a mathematical or clerical error, e.g., an error in calculation by the SNF, or overlapping or duplicate bills; (c) documentation was not submitted to substantiate that the services billed to Medicare were actually performed; and (d) Medicare paid for services not covered under the program and the SNF should have known the services were not covered (e.g., medically unnecessary services).

### 3. Medicare Coverage for Reasonable and Necessary Services

35. Coverage of health care services under Medicare is subject to the requirement that the services provided are reasonable and necessary for the treatment of an illness or injury or to improve the functioning of a malformed body part. Health care services that fail to meet this requirement will not be reimbursed by the government. *See* 42 U.S.C. § 1862 (a)(1)(A).

36. A specific health care service is *necessary* when it can be expected to make a meaningful contribution to the treatment of a patient's illness or injury.

37. Though the health care service may serve a medically necessary purpose, the SNF must also consider to what extent, if any, it would be *reasonable* for the Medicare Program to pay for the item prescribed, taking into account the following considerations:

(a) Would the expense of the item to the program be clearly disproportionate to the therapeutic benefits that could ordinarily be derived from use of the equipment?

(b) Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?

(c) Does the item serve essentially the same purpose as equipment already available to the beneficiary?

(d) Whether those same services could be provided as part of routine nursing care, including restorative care or wound care.

### 4. <u>Cost Reports</u>

38. All Part A participating providers such as Defendants are required to file cost reports each year with their fiscal intermediary. The cost report serves as the health care provider's final claim for payment from Medicare for the services rendered to program beneficiaries for the fiscal period in question. The cost report sets forth all of the provider's costs, accounts for the costs under applicable provisions of the Medicare statue and HHS program instructions, and results in a claim for a total amount of reimbursement for the fiscal year. *See* 42 C.F.R. §§ 413.20, 413.24.

39. In the cost report providers must document the costs incurred in furnishing items and services to Medicare beneficiaries, such as costs arising from arrangements with outside supplies under which the providers obtain items and services, including medical equipment and supplies. *See* 42 U.S.C. § 1395g(a); 42 U.S.C. § 413.20(b).

40. The cost report form requires a SNF officer or administrator to certify that he/she is "familiar with the laws and regulations regarding the provision of health care services and that the services identified in the cost report were provided in compliance with such law and regulations." *See* 42 U.S.C. § 1395g(a); *see also* 42 C.F.R. § 413.24(f).

41. Misrepresentation or falsifications of any information contained in a cost report is punishable by civil, as well as criminal and administrative action, fine and/or imprisonment under federal law. Further, if services identified in a cost report were provided or procured through the payment directly or indirectly of an illegal kick back or referral, civil, criminal and administrative action, fine and/or imprisonment may result. *See* 42 U.S.C. § 1395g (a); *see also,* 42 C.F.R. § 413.24(f).

## III. GENERAL ALLEGATIONS – HCR MANOR CARE & SUBSIDIARIES

42. Throughout years 2003 and 2004, Relator worked as a PRN Occupational Therapist at three skilled nursing facilities owned and operated by Defendant Manor Care Inc. d/b/a HCR Manor Care. Specifically, Relator worked at ManorCare Health Services in Fair Oaks, ManorCare Health Services in Arlington, and ManorCare Health Services in Alexandria.

43. While employed by Manor Care-Fair Oaks Relator Ribik observed various fraudulent and improper practices related to billing and provision of Medicare related benefits.

44. Through various internal policies and procedures, therapists employed by Defendants at ManorCare Health Services in Fair Oaks, ManorCare Health Services in Arlington, and ManorCare Health Services in Alexandria were encouraged to maximize their individual and, ultimately, Defendants' productivity by getting each patient in the highest RUG classification possible, regardless of the patient's need for extensive skilled therapeutic services. Consequently, most patients who were Part A participants were in the "very high" and "ultra high" RUG classifications even though their true RUG classification should have been in a lower tier.

45. Defendants purposely, and with fraudulent intent, classified various patients in high and ultra high RUG classifications, even when their physical condition did not warrant the need for such extensive services. Defendants' corporate practices and goals encouraged their physical therapy staff to maximize the number of minutes that they would spend with a patient during a reference period (the

period of time used to determine a RUG level). With most physical and occupational therapy, one would expect the length of therapy sessions to decrease over time. Either the patient improves or if there is no improvement, therapy should be discontinued. But the corporate practice at Manor Care was to attempt to increase billing time during a reference period, irrespective of patient need. In one example patient S began her physical therapy with daily sessions totaling some 45 minutes. Towards the end of her RUG reference period she had gone from 45 minutes of therapy to 120 minutes.

46. RUG categories are in part determined by an initial assessment done as part of the MDS (minimum data set) process. At Manor Care at Fair Oaks the MDS was completed by CC who, as a physical therapy assistant, lacked the experience and education to determine the initial level of care required for a Medicare patient. However, CC was placed in this position because she supported the corporate practices of excessive and improper billing, as outlined herein. These decision makers at Manor Care would make decisions to treat patients based on staff capacity and corporate goals to maximize billing, irrespective of actual patient need.

47. Defendants also submitted billing to Medicare for patients who simply did not require skilled physical or occupational therapy. As an example, while Relator was working at Manor Care patient L had met all his goals with occupational therapy: he was independent in dressing, bathing, light meal preparation and could ambulate over 200 feet and climb stairs unassisted. When Relator sought to discharge him, she was told not to discharge him because he was in the middle of a RUG reference period. When Ribik refused the patient was transferred to another therapist who went along with the recommendation.

48. Consistent with Defendants' goal to maximize Medicare billing, they also failed to discharge patients who were ready for discharge to outpatient services, so they could bill Medicare for skilled therapy, which was no longer necessary. The vast majority of Defendants' Medicare Part A patients

received care for 100 days despite the fact that many of these same patients were either eligible for home care or discharge.

49. In order to maximize their Medicare profits, Defendants through their managers, required therapists to meet aggressive and unrealistic hourly goal requirements, that were as high as 410 minutes during an 8 hour day. One manager of Manor Care would encourage his therapists to "rack em and stack him" to get all their minutes billed. In order to meet these goals, Relator Ribik observed therapists engaging in activities that resulted in fraudulent billing practices, the cost of which were passed on to the Medicare system. These practices included, without limitation:

(a) co-treating occupational therapy patients with a physical therapist, yet reporting the time separately to increase costs to Medicare;

(b) billing treatment time even when patients were not engaged in treatment but were asleep, walking to treatment, or toileting;

(c) over-reporting the number of hours actually spent administering treatment to patients;

(d) falsely stating that treatments were performed when in fact a patient had not been given treatment;

(e) refusing to release patients who did not qualify for skilled services according to Medicare guidelines, yet administering treatment and billing Medicare for treatments that were neither reasonable nor medically necessary;

(f) refusing to provide patients necessary medical equipment, such as wheelchairs and walkers, outside the therapy room, even though Part A covered and paid for such equipment;

(g) refusing to release patients once treatment objectives had been achieved;

(h) treating a group of patients at the same time, where a group is defined by Medicare regulations as four or more patients, yet billing Medicare the individual treatment rate for each patient involved in the therapeutic session;

(i) allowing non-licensed individuals to maintain a full caseload and treat patients, then billing Medicare for the treatment in derogation of Medicare regulations.

(j) filling out assessment records and MDS records in pencil so they could be changed at a later date to reflect additional or higher billings.

(k) billing for services which were not medical necessary or appropriate for patients, including use of peg boards and pumpkin carving.

(l) placing patients, who could independently ambulate in excess of 150 feet and perform their acts of daily living in skilled therapy programs when they did not qualify for or require such services.

(m) Defendants engaged in an administrative practice in which they deliberately waited until Medicare Part A coverage for its qualified patients had expired before fraudulently and improperly cost-shifting charges for medically necessary treatments to Medicare Part B in order to increase their rate of reimbursement from the government.

50. As additional examples of the above regulatory violations Ribik observed therapists billing hours far above what could possibly be billed in an eight hour day. One therapist known as CC billed in excess of 500 minutes after starting work at 8:30 a.m. and ending at 2:30 p.m. or earlier. This was accomplished through either double billing and/or billing group therapy as individual therapy.

51. Other specific conduct involved excessive billing time being submitted for services that simply did not require large amounts of time. Ribik observed therapists bill 90 minutes for wound care that should have been accomplished in 30 minutes or less. In another example patient M received

some 110 minutes for wound therapy in September of 2004. Most wound care can and should be provided as part of routine nursing care. However, Defendants would have their physical therapy staff provide wound care whenever possible because it was billable at a higher reimbursement rate.

52. When census was low, Defendants would pull patients from the general nursing home who were not eligible for physical therapy. Many of these patients included individuals with advanced Alzheimer's disease. Other patients were sent from the hospital to a Manor Care nursing home for limited IV antibiotics. Yet Defendants and their staff would frequently place such patients in physical therapy to maximize their Medicare billing. Relator Ribik consistently refused to treat patients who did not meet eligibility criteria under medical billing guidelines. However, other physical therapists would take on these same patients and as a result they were favored by management and promoted to positions of authority.

53. Relator Ribik refused to participate in what she knew were fraudulent practices and reported these abuses to management at Defendants' facilities. Defendants and their management staff, despite their awareness of the illegal and fraudulent billing practices, placed corporate profits above regulatory compliance, and continued to fraudulently bill Medicare for physical therapy and related services. This practice was perpetuated and extended after the merger with the Carlyle group.

54. Defendants not only failed to act upon Relator Ribik's concerns but endorsed the illegal activities. Moreover, Defendants encouraged and assented to these activities by providing incentives and bonuses to those Directors at Defendants' facilities who had the highest utilization rates. Moreover, those staff who went along with Defendants' goals were given the authority to determine RUG categories for reimbursement purposes. At Manor Care at Fair oaks, it was a physical therapy assistant that was given authority to determine such RUG levels, even though she did not have the training and education to make such decisions.

55. Moreover, in an effort to silence Relator Ribik and to quell her whistle-blowing activities, Relator Ribick was bullied, harassed and her employment was ultimately terminated.

56. Defendants filed claims for payment under Medicare Part A and Part B based on the illegal activity detailed above. Defendants and their staff operating within the course and scope of their employment falsely certified to its fiscal intermediary that it was in compliance with all state and federal laws and regulations in order to continue to obtain Medicare funding, even though it knew of, participated in, and assented to the illegal conduct and fraud.

57. Defendants' conduct, as described above, was part of overall corporate practice to increase billing reimbursements through Medicare. Defendants pursued high mandatory productivity requirements, which it knew or should have known would facilitate fraudulent, excessive and improper billing of Medicare.

## COUNT I

### VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1): PRESENTMENT OF FALSE CLAIMS

58. Relator realleges and incorporates by reference paragraphs 1 through 57 of the Complaint as though fully set forth herein.

59. Defendants knowingly, in reckless disregard and/or with deliberate ignorance of the truth or falsity of the information involved, presented or caused to be present, and is still presenting or causing to be presented to CMS or other federal programs, false or fraudulent claims for payment, in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1).

60. Defendants knowingly, in reckless disregard, or with deliberate ignorance of the truth or falsity of the information which supported claims to CMS, and other federal programs, with actual knowledge of the falsity of the information that supported these claims, caused, and is still causing, the use of false or fraudulent materials or information to support claims paid by the government in various ways, as described above.

61. The United States of America, unaware of the falsity of the claims made by Defendants, and in reliance on the accuracy of these claims, paid and may still be paying or reimbursing Defendants for unnecessary medical treatments, treatments not received, and medical devices not provided.

62. Had the United States of America been aware of Defendants' illegal and improper conduct in violation of the False Claims Act, Defendants would not have been reimbursed for their services.

63. As and direct and proximate result of Defendants' fraudulent conduct, as described above, the Treasury of the United States sustained significant economic damages in an amount to be calculated and proven at trial.

## COUNT II
## VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2): USE OF FALSE RECORD

64. Relator realleges and incorporates by reference paragraphs 1 through 63 of the Complaint as though fully set forth herein.

65. Defendants knowingly, in reckless disregard, or with deliberate ignorance of the truth or falsity of the information involved, made, caused, or caused to be used, and may still be using or causing to be used, false or fraudulent records and/or statements to get false or fraudulent claims paid in violation of, *inter alia*, § 3729(a)(2).

66. The United States of America, unaware of the falsity of the statements made by Defendants, and in reliance on the accuracy of these statements, paid and is still paying or reimbursing Defendants for unnecessary medical treatments, treatments not received and medical devices not provided.

67. Had the United States of America been aware of Defendants' illegal and improper conduct in violation of the False Claims Act, Defendants would not have been reimbursed for their services.

68. As and direct and proximate result of Defendants' fraudulent conduct, as described above, the Treasury of the United States sustained significant economic damages in an amount to be calculated and proven at trial.

**COUNT III**

**VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h): RETALIATION**

69. Relator realleges and incorporates by reference paragraphs 1 through 68 of the Complaint as though fully set forth herein.

70. As a result of Relator's whistle-blowing activities, Defendants discharged, threatened, harassed and discriminated against Relator by virtue of her lawful acts.

71. Relator is entitled to all the relief afforded by 31 U.S.C. § 3730(h), including without limitation, double back pay, front pay and special damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relator prays for judgment against all named Defendants, jointly and severally, as follows:

A. That Defendants be ordered to cease and desist from submitting any additional false claims, or further violations of 31 U.S.C. § 3729;

B. That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided by 31 U.S.C. § 3729(a), plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) or more than Eleven Thousand Dollars ($11,000.00) per claims as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d)

and 3730(h);

D. That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

E. That Relator be granted such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Relator demands a trial by jury of all issues so triable.

Respectfully Submitted,

Date: 1/6/08

Jeffrey J. Downey, VA Bar No. 31992
The Law Office of Jeffrey J. Downey, P.C.
1225 I Street, N.W.
Suite 600
Washington, D.C. 20005
Phone- 202-712-9120
Fax - 202-789-1116